Case number 31145, Stephen Caudle v. Hard Drive Express Inc, et al. Argument not to exceed 15 minutes per side. Mr. Flynn, you may proceed for the appellant. May it please the Court, my name is Keith Flynn. I'm an attorney with Miller Cohen PLC, and I represent plaintiff appellant Stephen Caudle in this matter. I'd like to reserve five minutes of my time for rebuttal. Mr. Caudle brought this lawsuit after his employer terminated him for demanding wages that he was entitled to under federal and state law. Under the Fair Labor Standards Act, wages must be paid free and clear, out-of-pocket expenses made for the benefit of the employer. Similarly, Michigan law also requires that employers pay employees for all wages earned. In this case, Mr. Caudle was instructed to maintain and repair defendant's semi-truck, but was not reimbursed for the hours he spent doing so or for his out-of-pocket expenses. Then, he was terminated on February 15, 2018, right after he told defendant owner James Betz that he was on his way to the labor board via text message. Just before that, Betz texted how very bitter he was over being asked to pay for having his truck taken in for repairs and maintenance. Three days before that, Mr. Betz texted Mr. Caudle, quote, when a driver says he wants paid for the time it takes to get something fixed on the truck makes my decision a lot easier. If Mr. Betz's retaliatory motivation wasn't clear enough at that point, he made it even clearer the day after the termination, which would have been February 16, 2018. On that occasion, Mr. Betz, who suffers apparently from some kind of compulsion to continue to berate people through text messages, Betz threatened Caudle with a retaliatory counterclaim if he decided to go to the labor board in Michigan. He said, oh, well, you know, there's $2,000, I have a $2,500 per occurrence for repairs made to my truck, and I'm going to basically fly spec and make sure I get every single ding or buff on it. That way, I'm going to then go after you if you decide to go forward with a claim for these unpaid wages to the Michigan Labor Board. Looking at this history of labor complaints to Mr. Betz, do you view that as context to what informs the notice that he ultimately provided in that chain of emails, or do you see that as a separate or claim that as a separate and independent basis for finding notice without regard to the text exchange? If I understand your question correctly, it's all part of the context. Cases have decided, such as the Moore case, the Morris case. Cases have found that when an employee reports and makes a complaint internally under FLSA to the employer, I mean, the Morris case is probably the best example. That was three months before the time that the employee was terminated. Here, the text messages make it abundantly clear that Mr. Betz was more than well aware of the complaints having been made. In fact, the defendant admitted as much in its motion for summary judgment in this case. But also, three days before the date of termination, Mr. Betz brought it up on his own to Mr. Cottle. Again, complaints don't have to be in writing. They can be oral pursuant to the casting case. As an analytical matter, do you consider this, we're talking about it under the notice prong, but is it actually also analyzable under the protected activity prong? Because in both, a complaint earlier is being made, that's the context in which this arises, and then you have the text. So both are separate elements, of course. Here we check off on the protected activity prong as well, because it's clear that Mr. Cottle did complain about unreimbursed out-of-pocket expenses, which would be covered under the FLSA. He continued to complain about his pay, and really the cases make it clear that all that's really necessary to be protected activity is a complaint about one's pay to one's employer. That would be sufficient for purposes of protected activity. The second element would be the knowledge element, and the knowledge element is most clear. That's the element that the district court dismissed his case on, finding that there was a want for notice or knowledge. In essence, and I have to say I'm a little confused about the district court's rationale on this. From my reading of their decision, it seems as though the district court was trying to put into that element a requirement that the protected activity has to happen on the day of termination. That there has to be clear knowledge of protected activity the day of the termination, and that's not enough for there to have been clear indications from the owner of the company that there have been long-term complaints made about the failure to pay these wages or out-of-pocket expenses. I'm not sure the judge articulated such a requirement rather than saying, well, I'm looking to what he said and it looks like it's in relation to something else. On that particular day, though. Right. In order for the court to come to the conclusion that- Well, I think your argument is that the judge failed to look at that interchange in context. Right? That's correct. As opposed to saying, well, it has to happen that day. That's absolutely correct, Your Honor. So more so, I would say that not only is it the context from before of the day in question when the employee was terminated, but also even looking at the text messages is clear based off of the text message chain. At least clear enough to show that inference could be made by a reasonable jury that a complaint had been made even on February 15th by Mr. Cottle. And specifically what I'm referencing is the chronology of the text messages going back and forth. So to begin with, Mr. Betz- The dispute is about whether he's just complaining about paid time off or also complaining about truck repairs, right? Yes. That's correct. All right. I mean, it seems- I don't know. It seems clear to me that the repairs come up in the course of the text exchange, right? I mean, now, Betz brings it up, it seems to me, at first. I don't know whether that has any impact on this analysis at all. It should have no impact, Your Honor. No, I'm just curious whether it's the employer who brings it up first or the employee. Does that matter in the course of the conversation? I'm not aware of a single case that says that that would matter. In fact, if anything, complaints going back three months have been found to be protected activity. Do you think that if we looked at the deposition admission that this would basically take care of it? Yes, I do. And so it's- there's a technical question about whether you had argued it sufficiently or not. But, I mean, it's pretty clear that- I mean, it doesn't even have to be clear. I suppose it creates a disputed issue of fact where he says, is that why you think he was making the complaint? Yes. I mean, that would seem to be enough to get to a jury if we looked at it, right? I mean, okay. That's why we're here today, quite frankly. But even Mr. Cottle even brought up after Mr. Betts had indicated- Betts says, in other words, I make loans with no interest and still expect to pay to have something done for the truck. Mr. Cottle responded immediately afterwards on February 15th, that's right, your truck, your company, I'll get my money. I'm going to argue- I'm not going to argue with you. I'll go to proper channels. So he's literally bringing up there that the repairs on the truck, yeah, it is your truck, and I'm entitled to my out-of-pocket expenses to fix your truck. With that, it looks as though I'm out of time. Thank you. You'll have your rebuttal. Thanks.  Good morning. My name is Guy Vining. I have the privilege of representing Jim Betts, who is the owner and defendant, and also the owner of Hard Drive Express. It seems to me that the judge in the lower court was correct in his opinion with respect to the motion for re-hearing, and we're having a re-hearing on that re-hearing this morning because the judge indicated that the arguments that are now being made were never made in the motions for summary judgment before the lower court. They first appeared at the time when a motion for re-hearing of the original judgment of dismissal- Which arguments were not made? I'm sorry? Which arguments were not made? Oh, the argument about the unreimbursed expenses and the deposition transcript for the first time. I understand that that part of the deposition was not argued below. Yes. But are you saying that the plaintiff did not argue that the conversation and the prior complaints constituted protected conduct? I think that the focus of what we argued before was whether Mr. Betz should have been able to divine from the conversation that the complaint on the day of termination, which I think was February 19th, I might be wrong, was solely regarding the- Well, he did divine it. He testified in his depo that that's what he thought the complaint was about.  And we're just- I mean, I'm looking at their summary judgment response. I mean, they say- This is page ID- I don't know what it is. It's ECF 30- Page ID 712. They're talking about being reimbursed for expenses relating to defendant's truck, FLSA. And then they cite- Yeah, they cite a page range from the depo, 260 to 264. I think that's exactly where he says that line, if I'm not mistaken. And maybe counsel can correct me. But it seems to me that they did cite the page where he does say that. So I don't know why that's not fair game at that point. Well, the question was, you know, what's your speculation or what's your guess as to that he was going to go to the Labor Board? Isn't it true that it was all these things? And so Mr. Betz was left to speculate what the motivation for going is. But if you read the conversation- Well, I mean, you can explain that to a jury, I guess. I mean, when you get there, you could say, look, ladies and gentlemen of the jury, this was confused, my client was confused, or, you know, whatever it is. I don't know. But it's- How can we resolve it as a matter of law? Well, it's smaller than that because the employee has a duty to state, so the employer is on notice, what the complaint is about. And if you read- There's a whole series of e-mails the day of the termination after Mr. Caudill was terminated. But if you read the e-mails that are- They're at 12.56 p.m. The sole purpose of Mr. Caudill's call was to make a complaint that he wanted to get this new benefit, this paid time off benefit. And Mr. Betts said to him, you can get it just like everybody else, and it's a nice benefit, it's about $1,000 a year, but you have to qualify for it. And to qualify for it, you have to work two weeks before the time off, and then you have to work the two weeks after. That's what the whole conversation was about. I'm looking at that beginning, and I would agree that that's where he began. Yes, Your Honor. But then, before he is fired, Caudill says, that's right. Your truck, your company, I'll get my money. Don't worry about it. I'm not going to argue with you. I'm going to the proper channels. I've been down this road before. Betts responded, I help all these people. I don't charge them interest. Then ask someone to take a truck to get something taken care of, and they want paid for it. That makes me bitter. I mean, that's exactly the question. The question here is money for reimbursement. It's Mr. Betts who honestly brings it up. Then there's this, can I call you back a little bit later, and then there's the threat to go to labor and report it, and then he's fired. So it's already part of the conversation. He's fired in the first conversation. Mr. Betts says to him, this is the last paragraph in that conversation, about halfway through. I have nothing to be scared of. Go ahead. You can threaten me all you want. It doesn't bother me. And then Mr. Betts is talking about the paid time off. There's absolutely nothing in the laws that say that I have to give you paid time off. Skipping ahead, he says park the driver's truck and make sure it's in good shape. That's exactly the order. That is correct. The order is Mr. Betts, and he spoke about the taking care of the truck, and they want to get paid for it. And then Betts says, they talk a little more about the days off, and then he fires him. So they already had the conversation here that they had been having for two years. I don't understand the argument that that was not discussed before he was fired in this exchange. Let's talk about, I guess the word is context of this first call, right? This first call takes place at a time when Mr. Caudill knows that he's leaving the company. Well, you know, counsel, that's really not what this is about. I think the issue here is whether, and you're correct, I know you've placed some of that in the record, but I don't think that's our issue. We're trying to figure out what he was on notice of, and the law in the Sixth Circuit gives a lengthy time between complaints before, and that can be considered in the context of placing an employer on notice, and it qualifies as protected activity. And so my question is, this was the next to the last thing that Betts spoke about, was the very thing that on three exchanges later, he was fired. No, he's fired in the first exchange, Your Honor, with all due respect. If you'd look down at the last paragraph, Mr. Betts says to him, park the driver's truck, that's Mr. Caudill's truck. And what I'm reading to you is three exchanges before that language. I agree with you, park the truck, but three exchanges before that language, they're already talking about getting paid. Those exchanges are after the first. No, sir, we begin with the vacation pay, and then we move historically down. And in those, the park the truck is the discharge after the statement that he is bitter because they want to be paid for repairing trucks. Well, you know, maybe bitter is the wrong word, disappointed. Here's a guy, he's getting a complaint about the paid time off policy. And the only, I mean, who would call the complaint about the paid time off policy? It's a benefit. It's a good thing. So what Mr. Caudill's trying to do, he's not in good faith with Mr. Betts. He's trying to threaten him with a complaint with the Labor Board that he's not entitled to because you have to look at what the paid time off policy says. And it says the different qualifications. So Caudill says to him, you get it for me right now or I'm on my way to the Labor Board. Well, Mr. Betts points out to him that to be qualified for it, to be qualified for the paid time off, you've got to work two weeks before, two weeks after. Mr. Caudill is upset about the reason for his call is he knows he's leaving the company. He knows he can't work the two weeks before. He knows he can't work the two weeks after. And that's because he took a job, actually became self-employed with a company called Rio Transport. And he was back to work on, I think it was March the 3rd. So this is not a good faith complaint. It's not a complaint that sets forth with any specificity before Mr. Betts terminates him. Anything other than the paid time off policy. In fact, right out of the box, Mr. Caudill, his first comment is, how does that vacation pay work? I need to take some time off. Right. He sets the context for it. And to me and to the trial court judge, it was just plain as the nose on my face that that's what the context was. The sole purpose of the call was that the policy had just come out. And Mr. Caudill looked at it and goes, oh my goodness, I'm not going to qualify. I think I'll call up Mr. Betts and have an argument with him. And that's what he did. But the conversation grew, right? And it returned to old grievances. Well, Mr. Betts was, what would you call it, ruminating about, here, I try to do everything good for you folks. I try to get extra money for you. And he's ruminating about how people are ungrateful, I think, is what he's doing. Right. And showing that asking for the money is very much on his mind. Well, he's talking about people. He says, make loans with no interest and still expect to pay to have something done for the truck. Right. And the policy with respect to truck repairs, let me just point this out, if I may. Exhibit number nine, I don't have the official docket entry, but exhibit number nine to our motion for summary judgment is the company policy with respect to duties of employees. You need to bear in mind when you decide this case, this is not a low income person. In 2017, Mr. Cottle made four times minimum wage. So this isn't some guy making $7 an hour. And in the policy, exhibit number nine, it talks about you're paid by the mile, but built into that pay, these are your duties. You have to keep the truck in good shape. These are almost brand new trucks. And so one of the only things that these drivers have to do is to periodically pull into a garage on I-75, there's a number of them, and get oil changed, get the tires checked and so forth. That's what Mr. Cottle's complaining about. But it's built into the pay structure as well, where each driver is paid, I think it works out to $450 every three months for maintenance. It's built into the per mile pay structure. So there's never been a cause for any kind of complaint. Indeed, that's after Mr. Vets talked with Mr. Cottle about these different complaints through the years. Mr. Cottle never filed a complaint. So now he's going to pull a rabid out of his hat and he's going to try to get a PTO pay time off benefit that he's clearly not entitled to. Your red light is on now. Oh, yes. Just a minute to conclude. Well, I'd just ask you to affirm the trial court. The judge looked at this very carefully, not only once but also a second time on the motion for rehearing. And I do thank you for your time. Your Honors, I am willing to yield the remainder of my time unless there's additional questions that any of you have about the briefings. Further questions? Did you cite that deposition in that? Am I correct about that or not? That's correct. But only in it looks like it's in passing. It's like in a 260 to 264. Does that encompass that statement? I believe it's 264, yes. But also we cited to many other parts of Mr. Betz's deposition testimony that were just as bad. You didn't refer to the question and answer in your brief, right? Are you referring to the one on 264? I don't think that we specifically went into it and expressly went into it, but we made arguments about it. And I think that would have been on page ID 173, if I'm not mistaken. But also we cited to other parts of Mr. Betz's deposition transcript as well, including when he had actually asked, I had asked him, rather, whether or not, I had asked Mr. Betz, well, what are you referring to? When you're talking about he does it all the time. And he specifically mentioned the complaint about wages. He expressly stated that. And that was most certainly in our response brief. Questions? No. You concede that that email exchange or the conversation began with a question about the benefits? That's absolutely correct. It did begin there, but then, of course, Mr. Betz brought up. Okay. In response to that, no less. I would like to make one additional point about the PTO time. Mr. Betz had articulated this two-week period before and two-week period after policy. If you look at the employee handbook, no such policy exists in there. Another point to make mention of in terms of the PTO policy is that while he said he's going to hold him strictly to 30 days advance notice, the PTO policy in the employee handbook actually says, or as soon as possible. And I think that in the context of Mr. Betz's further comments where he's saying, I try to be nice to the drivers, I try to be nice to you guys, and then all of a sudden you're asking me to pay you for the repairs done on my truck. Putting those together, it's easy to see how a jury could infer that the PTO policy even changed for Mr. Caudill, given his reports of the misconduct relating to the FLSA. All right. We thank you for both your briefings and your arguments. The case will be taken under advisement and an opinion issued in due course.